No. 24-60529

# In the United States Court of Appeals for the Fifth Circuit

STATE OF MISSISSIPPI, STATE OF MONTANA, STATE OF
LOUISIANA, STATE OF NEBRASKA, STATE OF TENNESSEE, STATE OF
TEXAS, STATE OF UTAH

*Petitioners,*

v.

DEPARTMENT OF ENERGY,

*Respondent.*

## INITIAL BRIEF FOR PETITIONERS

AUSTIN KNUDSEN
  *Attorney General*
CHRISTIAN CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
MONTANA DEPT. OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

JOSEPH S. ST. JOHN
  *Montana Spec. Asst. Sol. Gen.*
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
(410) 212-3475
scott@stjohnlaw.com

JUSTIN L. MATHENY
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

No. 24-60529

_____

S<small>TATE OF</small> M<small>ISSISSIPPI</small>, S<small>TATE OF</small> M<small>ONTANA</small>, S<small>TATE OF</small> L<small>OUISIANA</small>,
S<small>TATE OF</small> N<small>EBRASKA</small>, S<small>TATE OF</small> T<small>ENNESSEE</small>, S<small>TATE OF</small> T<small>EXAS</small>,
S<small>TATE OF</small> U<small>TAH</small>

*Petitioners,*

v.

D<small>EPARTMENT OF</small> E<small>NERGY</small>,

*Respondent.*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. <u>Petitioners</u>: State of Mississippi, State of Montana, State of Louisiana, State of Nebraska, State of Tennessee, State of Texas, and State of Utah.

2. <u>Counsel for Petitioners:</u>

    a. For the State of Mississippi: Lynn Fitch, Attorney General; Justin L. Matheny, Deputy Solicitor General, both with the Mississippi Attorney General's Office.

b. For the State of Montana: Austin Knudsen, Attorney General; Christian Corrigan, Solicitor General; Peter M. Torstensen, Jr., Deputy Solicitor General, all with the Montana Department of Justice; and Joseph S. St. John, with St. John LLC.

c. For the State of Louisiana: Liz Murrill, Attorney General; J. Benjamin Aguiñaga, Solicitor General, both with the Louisiana Department of Justice.

d. For the State of Nebraska: Michael T. Hilgers, Attorney General; Zachary B. Pohlman, Assistant Solicitor General, both with the Nebraska Department of Justice.

e. For the State of Tennessee: Jonathan Skrmetti, Attorney General; J. Matthew Rice, Solicitor General; Whitney D. Hermandorfer, Director of Strategic Litigation, all with the Office of the Tennessee Attorney General.

f. For the State of Texas: Ken Paxton, Attorney General; Brent Webster, First Assistant Attorney General; Aaron L. Nielson, Solicitor General; William F. Cole, Deputy Solicitor General, all with the Office of the Attorney General for the State of Texas.

g. For the State of Utah: Derek Brown, Attorney General; Sean Reyes, former Attorney General; Stanford Purser, Solicitor General, all with the Office of the Utah Attorney General.

3. <u>Respondent</u>: United States Department of Energy; Chris Wright, Secretary of Energy; Jennifer Granholm, former Secretary of Energy

4. <u>Counsel for Respondents</u>: Pam Bondi, Attorney General; Merrick Garland, former Attorney General; Sarah N. Smith, Attorney; Michael S. Raab, Attorney; all with the U.S. Department of Justice.

5. <u>Movant-Intervenor</u>: Sierra Club.

6. <u>Counsel for Movant-Intervenor Sierra Club</u>: Timothy Ballo with Earthjustice.

*/s/ Joseph S. St. John*
Attorney of Record for
Petitioner State of Montana

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner States respectfully request oral argument. Given the importance of the issues presented, as well as the complexity of the statutory interpretation questions at issue, the States submit that oral argument will assist this Court in resolving the issues presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS....................................ii

STATEMENT REGARDING ORAL ARGUMENT ............................v

TABLE OF CONTENTS..........................................................vi

TABLE OF AUTHORITIES...................................................viii

GLOSSARY .......................................................................1

INTRODUCTION ................................................................2

STATEMENT OF JURISDICTION .........................................3

STATEMENT OF ISSUES ....................................................4

STATEMENT OF THE CASE.................................................4

I. The Energy Policy Conservation Act .....................................4

II. The History of Cooking Products Efficiency Standards .....................8

III. The Cooking Products Direct Final Rule...........................13

STANDARD OF REVIEW....................................................16

SUMMARY OF ARGUMENT ..............................................17

ARGUMENT .....................................................................19

I. The carefully curated Joint Agreement should not have triggered a DFR, and the Standards should have been withdrawn. ........................19

A. The DFR process was historically limited to noncontroversial rules, with any adverse comment sufficient to cause withdrawal. ..................19

B. EPCA requires true consensus, and a DFR "*shall*" be withdrawn if a comment merely "*may* provide a reasonable basis" for doing so............22

C. The Joint Agreement is a settlement agreement by parties that are not fairly representative; it is not a non-controversial efficiency standard. 24

D. The Petitioner States' adverse comments should have triggered withdrawal of the Standards. .................................................................25

II. DOE failed to consider the impact of the Standards on product lifespan................................................................................................28

**CONCLUSION**.......................................................................................37

**CERTIFICATE OF SERVICE**.......................................................40

**CERTIFICATE OF COMPLIANCE**......................................41

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Power Co. v. EPA*, 135 F.3d 791 (D.C. Cir. 1998) ............ 33

*Chamber of Comm. v. Dep't of Labor*, 85 F.4th 760 (5th Cir. 2023). 17, 33

*Chamber of Comm. v. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) 27, 32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................... 32

*George v. McDonough*, 596 U.S. 740  (2022) .......................................... 22

*In re United States*, 583 U.S. 1029 (2017) ............................................ 27

*Louisiana v. Dep't of Energy*, 90 F.4th 461 (5th Cir. 2024) ...................... 2

*Miss. Poultry Ass'n v. Madigan*, 992 F.2d 1359 (5th Cir. 1993) ............ 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29 (1983) ........ 36

*Noranda Alumina, LLC v. Perez*, 841 F.3d 661, 665 (5th Cir. 2016) ..... 34

*NRDC, Inc. v. Herrington*, 768 F.2d 1355 (D.C. Cir. 1985) .............. 17, 33

*Ohio v. EPA*, 603 U.S. 279 (2024) .......................................................... 36

*Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018) .............. 11

*Schofield v. Saul*, 950 F.3d 315, 320 (5th Cir. 2020) ............................ 17

*T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293 (2015) ..................... 22

*United States v. ALCOA*, 377 U.S. 271 (1964) ....................................... 23

*United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399 (1914) ... 23

**Statutes**

42 U.S.C. § 6201 ....................................................................................4

42 U.S.C. § 6206 ............................................................................. 16, 17

42 U.S.C. § 6291 ..................................................................................36

42 U.S.C. § 6295 ........................................................................... passim

5 U.S.C. § 706 .......................................................................................17

Energy Independence and Security Act of 2007, Pub. L. 110-140, 121

    Stat. 1492 (2007)...........................................................................8

Energy Policy and Conservation Act, Pub. L. 94-163, 89. Stat. 871 (1975)

    ...................................................................................................4, 5

National Appliance Energy Conservation Act of 1987, Pub. L. 100-12, 101

    Stat. 103 (1987)..............................................................................5

National Energy Conservation Policy Act, Pub. L. 95-619, 92 Stat. 3206

    (1978) .............................................................................................5

**Other Authorities**

Michael Kolber, *Rulemaking Without Rules: An Empirical Study of Direct*

    *Final Rulemaking*, 72 Alb. L. Rev. 79, 89 (2009).................................20

MIL-HDBK-217 .....................................................................................31

S. Rep. No. 94-26 (1975) ..........................................................................4

## Regulations

46 Fed.Reg. 44476 (Sept. 4, 1981)........................................................20

59 Fed.Reg. 4669 (Feb. 1, 1994).........................................................20

60 Fed.Reg. 43108 (Aug. 18, 1995)......................................................21

63 Fed.Reg. 48038 (Sept. 8, 1998)........................................................8

65 Fed.Reg. 59590 (Oct. 5, 2010).......................................................36

70 Fed.Reg. 7673 (Feb. 15, 2005)........................................................21

73 Fed.Reg. 62034 (Oct. 17, 2008)........................................................9

77 Fed.Reg. 8526 (Feb. 14, 2012).......................................................30

79 Fed.Reg. 71894 (Dec. 3, 2014).......................................................10

79 Fed.Reg. 8337 (Feb. 12, 2014).........................................................9

80 Fed.Reg. 33030 (June 10, 2015).....................................................10

80 Fed.Reg. 37954 (July 2, 2015).......................................................10

81 Fed.Reg. 57374 (Aug. 22, 2016).....................................................10

81 Fed.Reg. 60784 (Sept. 2, 2016)......................................................10

81 Fed.Reg. 65720 (Sept. 23, 2016)....................................................33

81 Fed.Reg. 91418 (Dec. 16, 2016).....................................................10

83 Fed.Reg. 17944 (Apr. 25, 2018)......................................................11

85 Fed.Reg. 50757 (Aug. 18, 2020).....................................................11

85 Fed.Reg. 80982 (Dec. 14, 2020) ........................................................ 11

88 Fed.Reg. 6818 (Feb. 1, 2023) .................................................... passim

89 Fed.Reg. 11434 (Feb. 14, 2024) ................................................ passim

89 Fed.Reg. 65520 (Aug. 12, 2024).................................................. 30, 36

# GLOSSARY

ARID            Administrative Record ID

Confirmation    *Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products* 89 Fed. Reg. 65520 (Aug. 12, 2024).

DFR             Direct Final Rule

DOE             United States Department of Energy

EPCA            Energy Policy and Conservation Act

Standards       *Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products*, 89 Fed. Reg. 11434 (Feb. 14, 2024)

## INTRODUCTION

Last year, this Court castigated the Department of Energy ("DOE") for ignoring reality in adopting putative energy efficiency standards. *Louisiana v. Dep't of Energy*, 90 F.4th 461 (5th Cir. 2024). DOE had ignored that dishwashers with poor performance and long cycle-times result in consumers running energy *inefficient* multiple cycles or undertaking energy *inefficient* handwashing. Indeed, DOE ignored its own prior statements acknowledging as much.

DOE did it again the month after *Louisiana* issued, this time with "cooking products," *i.e.*, stoves and ovens. DOE mandated complex components it previously said have lower reliability, then assumed product lifespan isn't affected. When confronted with engineering textbooks stating the obvious—more parts and greater complexity shortens lifespan—DOE dismissed the problem as "theoretical conjecture." DOE then ignored its own statements about reliability, as well its own statements emphasizing the importance of analyzing energy use over a product's entire lifecycle. Worse, DOE proceeded via a direct final rule—reserved for noncontroversial acts—over the objection of 23 states. This Court should set aside the cooking products standards.

## STATEMENT OF JURISDICTION

On February 14, 2024, DOE published a direct final rule ("DFR") to establish new and amended energy conservation standards for consumer conventional cooking products, i.e., stoves and ovens, and opened a statutory 110-day comment period. *Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products*, 89 Fed. Reg. 11434 ("Standards"). DOE "confirmed" its DFR on August 12, 2024, and stated it had "determined that the comments received in response to the [DFR] do not provide a reasonable basis for withdrawing the [DFR]." *Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products* 89 Fed. Reg. 65520 ("Confirmation"). Petitioners timely filed their petition in this Court on October 10, 2024. This Court has jurisdiction pursuant to 42 U.S.C. § 6306(b).

## STATEMENT OF ISSUES

1.  Whether the Joint Agreement and the associated Standards complied with the Direct Final Rule requirements of the Energy Policy Conservation Act.

2.  Whether DOE's refusal to withdraw the Standards violated the Direct Final Rule requirements of the Energy Policy Conservation Act and/or was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## STATEMENT OF THE CASE

## I.   The Energy Policy Conservation Act

In the wake of the 1973-74 oil embargo, Congress enacted the Energy Policy and Conservation Act, Pub. L. 94-163, 89. Stat. 871 (1975) ("EPCA"). Congress viewed the embargo as showing a need for "legislation which would facilitate the reduction of the nation's petroleum consumption through energy conservation." S. Rep. No. 94-26, at 27 (1975). Consistent with that view, the stated purposes of EPCA include conservation of energy supplies through energy conservation programs and improving the energy efficiency of major appliances. 42 U.S.C. § 6201(4), (5).

As originally enacted, EPCA authorized the Federal Energy Administration—the predecessor to DOE—to implement "energy efficiency improvement target[s]" for consumer products, followed by mandatory energy efficiency standards if industry reports showed the targets were unlikely to be met. Pub. L. 94-163, §§ 322, 325, 89 Stat. at 923-26. Congress thereafter amended EPCA to eliminate the "target" step in favor of directly issuing mandatory energy efficiency standards, and to provide for review of those standards every five years. National Energy Conservation Policy Act, Pub. L. 95-619, 92 Stat. 3206, 3259-62 (1978).

Congress again substantially amended EPCA in 1987. Among other things, the amendments set forth much of the process DOE is required to follow in prescribing new or amended efficiency standards. National Appliance Energy Conservation Act of 1987, Pub. L. 100-12, 101 Stat. 103, 114-16. EPCA now provides, *inter alia*, that:

> (A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency … which the Secretary determines is technologically feasible and economically justified.
> (B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving

views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

42 U.S.C. § 6295(o).

EPCA also forbids standards in certain circumstances. DOE cannot prescribe an efficiency standard if a "test procedure has not been prescribed," the "standard will not result in significant conservation of energy," "the establishment of such standard is not technologically feasible or economically justified," or the standard is "likely to result in the unavailability in the United States in any covered product type (or

class) of performance characteristics (including reliability), features, [etc.] that are substantially the same as those generally available in the United States….” *Id.* § 6295(o)(3),(4). So-called “backsliding” is also forbidden: when DOE undertakes its periodic review of efficiency standards, DOE can decide no amendment is necessary, but the agency cannot amend the standards so as to weaken efficiency requirements. *Id.* § 6295(o)(1).

In 2006, the Secretary of Energy wrote to Congress complaining that the rulemaking process specified in EPCA—which required an advanced notice of rulemaking, a notice of rulemaking, then a final rule— had “hindered the expeditious promulgation of rules to establish … energy conservation standards, even in cases where there is broad agreement among stakeholders as to the appropriate standard levels.” Dkt. 42-2. The Secretary accordingly proposed legislation to “authorize special rulemaking procedures that would allow the Secretary to prescribe energy conservation standards by direct final rule.” *Id.* He explained that “[u]se of this authority would be limited to circumstances in which … representatives of all relevant interests (including manufacturers of covered products, efficiency advocates, and State

officials) negotiate on their own initiative and submit a joint comment …

proposing an energy conservation standard." *Id.* "If there is no objection

to the jointly proposed standard, the direct final rule would become

effective 120 days after the notice is published." *Id.* But "[i]f any person

files a significant adverse comment … the Secretary would be required to

withdraw the direct final rule and move forward under the procedures of

existing law…." *Id.* Congress adopted the requested legislation for direct

final rules—albeit with changes—the following year. Energy

Independence and Security Act of 2007, Pub. L. 110-140 § 308, 121 Stat.

1492, 1560-61 (codified at 42 U.S.C. § 6295(p)(4)).

## II.     The History of Cooking Products Efficiency Standards

The efficiency standards for stoves and ovens—now called cooking

products by DOE—started with a simple, prescriptive ban on "constant

burning pilot" lights for "gas kitchen ranges and ovens having an

electrical supply cord." 42 U.S.C. § 6295(h). When DOE first considered

regulatory standards for electric cooking products in 1998, it determined

such standards would not result in a significant conservation of energy,

and they would not be economically justified. 63 Fed.Reg. 48,038 (Sept.

8, 1998). So no standards were adopted.

DOE revisited that decision in 2008, with the idea that "[m]ultiple improvement paths with varying risk to manufacturers are available, including … transition to switching power supplies." 73 Fed.Reg. 62034, 62051 (Oct. 17, 2008). As relevant here, a power supply converts the 60 Hz, 120 volt electricity supplied in the United States to the direct current and/or lower voltage used by the appliance. DOE explained that, as compared to other designs, switching power supplies "offer the highest conversion efficiencies (up to 75 percent) and lowest no-load standby losses (0.2 W or less) though at a higher cost, higher part count, and greater complexity." *Id.* But DOE noted the obvious drawback: "potentially lower reliability." *Id.* at 62079. The agency decided not to adopt efficiency standards for electric cooking products because it again determined that "no cooking efficiency standards for these products were found to be technologically feasible and economically justified." 74 Fed.Reg. 16040, 16041 (Apr. 8, 2009). DOE did, however, expand the prescriptive pilot light prohibition for gas cooking products to include those without an electrical supply cord. *Id.*

DOE again revisited the standards for cooking appliances in 2014. 79 Fed.Reg. 8337 (Feb. 12, 2014). The agency announced that—for at

least some appliances—it would consider energy efficiency from changing conventional linear power supplies to switch-mode power supplies. *Id.* at 8345. What followed, however, was years of disputes regarding how to test the efficiency of cooking products. *See* 79 Fed.Reg. 71894 (Dec. 3, 2014); 80 Fed.Reg. 37954 (July 2, 2015); 80 Fed.Reg. 33030 (June 10, 2015); 81 Fed.Reg. 57374 (Aug. 22, 2016).

In the waning days of the Obama Administration, DOE proposed a prescriptive standard that would ban traditional linear power supplies, and the agency for the first time inquired about altering its test procedures to evaluate increasingly popular "commercial-style" cooking products with high input burners. 81 Fed.Reg. 60784 (Sept. 2, 2016). Indeed, DOE sent the appliance industry's trade group—the Association of Home Appliance Manufacturers ("AHAM")—a request for data to help with the agency's analysis. AHAM informed DOE that it would provide the requested data, and it did so on November 22, 2016. But despite having asked for that data and having been informed AHAM would be providing it, DOE issued a final test procedure on that following day, November 23, 2016, which it published on December 16, 2016. 81 Fed.Reg. 91418 (Dec. 16, 2016).

AHAM petitioned for reconsideration, noting DOE's data request and stating that AHAM's analyses showed the agency's test procedure was not representative for gas cooking tops and, for gas and electric cooking tops, had such a high level of variation it would not produce accurate results…." 83 Fed.Reg. 17944 (Apr. 25, 2018). DOE accordingly withdrew its test procedure rule, 85 Fed.Reg. 50757 (Aug. 18, 2020), but was sued in the interim by environmental activists and ideologically aligned states for delaying revised efficiency standards, *see Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 32-33 (D.D.C. 2018); *California v. Trump*, 613 F. Supp. 3d 231, 250-51 (D.D.C. 2020).

A few months later, DOE published a notification that it was proposing not to amend the energy conservation standards for consumer conventional cooking products. 85 Fed.Reg. 80982 (Dec. 14, 2020). DOE explained that it had initially determined that "amended energy conservation standards for consumer conventional cooking products … would not be economically justified and would not result in a significant conservation of energy." *Id.*

On February 1, 2023, DOE reversed course and published a supplemental notice of proposed rulemaking that included both

performance standards in terms of energy consumption, as well as a prescriptive ban on linear power supplies. 88 Fed.Reg. 6818, 6894 (Feb. 1, 2023) ("2023 SNOPR"). By DOE's own calculations, the life cycle benefit to consumers would be as low as $0.59. *Id.*

DOE noted that AHAM had recently questioned whether such a standard would be justified under EPCA. *Id.* at 6827. Indeed, DOE recounted AHAM's statement that no significant changes had occurred to justify new standards since the April 2009 Final Rule that determined that energy conservation standards for consumer conventional cooking products were not justified. *Id.* at 6828; *see also* ARID.0084 ("Nothing of significance has changed since DOE determined in 2009 that amended energy conservation standards for conventional cooking products were not justified."). Twenty-two states—including all of the Petitioners—also commented. They noted public statements by AHAM that "the vast majority of gas cooking appliances do not comply with the" standards proposed in the 2023 SNOPR, and they suggested DOE was acting opaquely to avoid Congressional pushback for a proposed standard that *de facto* banned gas stoves. ARID.0117.

## III.   The Cooking Products Direct Final Rule

AHAM commented that the 2023 SNOPR had significant testing flaws, appeared to inappropriately favor electric over gas cooking products, would unlawfully eliminate consumer-desired features, and would eliminate gas cooktops. ARID.0137. Indeed, AHAM noted only 4.7% of gas cooktops in DOE's sample could meet the standard, as compared to 80% of electric cooktops. *Id.* Whirlpool lodged a similar comment: "There are very few, if any, gas cooktops and no gas ranges that can meet the proposed standards," and Whirlpool had "not identified or tested a single gas cooktop or gas range model in its product line that meets the proposed standard." ARID.136. In a follow-up comment dated September 1, 2023, AHAM urged that "[f]or gas cooktops, DOE has failed to identify actual technology options and has instead dressed up the removal of product features and/or performance attributes to look like technology options and failed to demonstrate that doing so would not … result in the unavailability of products, features, and utilities similar to those available on the market today." ARID.162.

Later that month, the appliance industry cried uncle. After years of legal and regulatory fighting—and despite definitive industry statements that many consumer appliances are operating at the realistic limit of available technology—the industry capitulated. AHAM entered a "Joint Agreement" with environmental activists that proposed energy efficiency standards for multiple categories of consumer appliances, all as a take-it-or-leave-it package.

To trigger DOE action, the Joint Agreement was quietly deposited in otherwise inactive rulemaking dockets. ARID.167. Although they did not sign the Joint Agreement, supporting letters from a small number of ideologically aligned state agencies charged with, *e.g.*, "implementing New York State's climate agenda" were shortly thereafter deposited in those same inactive dockets. ARID.165.

Citing the direct final rule provisions of EPCA, DOE then began publishing a series of direct final rules to implement the standards in the Joint Agreement. As relevant here, DOE published notice of a DFR titled "Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products." 89 Fed.Reg. 11434 (Feb. 14, 2024). The DFR proposed the same prescriptive ban on linear power

supplies for ovens as DOE had proposed in the 2023 SNOPR, but lower performance standards for electric coil and gas cooking tops:

| Product Class | 2023 SNOPR | 2024 DFR |
|---|---|---|
| Electric Open (Coil) Cooking Tops | 199 kWh/yr | No standard |
| Electric Smooth Element Standalone Cooking Tops | 207 kWh/yr | 207 kWh/yr |
| Electric Smooth Element Cooking Top Component of Combined Cooking Products | 207 kWh/yr | 207 kWh/yr |
| Gas Standalone Cooking Tops | 1,204 kBtu/yr | 1,770 kBtu/yr |
| Gas Cooking Top Component of Combined Cooking Products | 1,204 kBtu/yr | 1,770 kBtu/yr |

*Compare* 88 Fed.Reg. at 6894 *with* 89 Fed.Reg. at 11436. Under the DFR, life cycle cost savings were as low as $3.09. 89 Fed.Reg. at 11437.

Led by Nebraska, 23 states filed a comment opposing the DFR based on, *inter alia*, the Joint Agreement not complying with the statutory requirements for a DFR, particularly in view of its non-representative and ideologically-skewed support. ARID.187. Utah and Montana joined Nebraska's comment in full, but elaborated that the increased device complexity and lighter materials required to meet DOE's energy conservation standards likely shortened device lifespan. ARID.190. The States further explained that DOE was incorrectly

assuming there was no impact on lifespan in its energy and economic analyses, *i.e.*, DOE assumed away a major part of the problem.

On August 12, 2024, DOE "confirmed" the DFR in "Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products," 89 Fed. Reg. 65520 ("Confirmation"). On its face, that publication identifies the "action" as a "direct final rule." *Id.* at 65520. DOE stated it had determined that the comments received in response to notice did not provide a reasonable basis for withdrawing the rule.

Seven States—Mississippi, Montana, Louisiana, Nebraska, Tennessee, Texas, and Utah ("Petitioners")—petitioned this Court for review of the Confirmation, as well as Standards, asking this Court to hold unlawful, vacate and set them aside. That petition was filed on October 10, 2024, *i.e.*, less than 60 days after DOE's August 12, 2024 action. DOE moved to dismiss, and the motion was carried with the case.

## STANDARD OF REVIEW

EPCA efficiency standards are reviewed "in accordance with chapter 7 of title 5, United States Code," *i.e.* the Administrative Procedure Act. 42 U.S.C. § 6206(b)(2). The reviewing court must "hold

unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory … authority or limitations"; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706.

"No rule under [42 U.S.C. §§ 6293, 9294, or 6295] may be affirmed unless supported by substantial evidence." 42 U.S.C. § 6206(b)(2). "Substantial evidence requires at least … evidence." *Schofield v. Saul*, 950 F.3d 315, 320 (5th Cir. 2020). The Court must set aside a rule that "contains no discussion of any evidence or citation to DOE studies," *NRDC, Inc. v. Herrington*, 768 F.2d 1355, 1398 (D.C. Cir. 1985), or that fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Chamber of Commerce of the U.S. v. Dep't of Labor*, 85 F.4th 760, 768 (5th Cir. 2023).

## SUMMARY OF ARGUMENT

The concept of "direct final rulemaking" was always understood as limited to non-controversial rules. Historically, almost any opposition

was sufficient to trigger withdrawal of the DFR in favor of traditional rulemaking.

When Congress amended EPCA to permit direct final rulemaking, it incorporated that cluster of ideas. The statute accordingly requires a "joint statement" by "interested persons fairly representative of relevant points of view" for DOE to initiate a DFR. 42 U.S.C. § 6295(p)(4)(C). The statute then mandates withdrawal of the DFR if an adverse public comment merely "*may* provide a reasonable basis for withdrawing" the DFR, *id.*, a low bar that requires mere possibility, not certainty.

The 2024 Standards did not meet the requirements for a DFR. Regardless, the low bar for mandatory withdrawal was readily satisfied here. Twenty-three states responded to the 2024 Standards with substantive objections, including as to the Joint Agreement's ideologically curated support, DOE's failure to address industry comments, and the pressure put on industry to deflect DOE's proposed standards that would have effectively banned gas stoves.

Two of the objecting States further faulted DOE for failing to consider the impact of its efficiency standards on product lifespan, particularly in view of DOE's statements regarding the lack of reliability

for the power supplies it is mandating. The States' point literally derived from engineering textbook excerpts that they included in the administrative record.

DOE acted arbitrarily and capriciously in not withdrawing the DFR. To that end, DOE made inconsistent statements and took inconsistent positions; consciously refused to engage with parts of the administrative record that were adverse to the 2024 Standards; deviated from its own past practices; and ignored a key aspect of the problem highlighted by its own statements.

## ARGUMENT

**I.**   **The carefully curated Joint Agreement should not have triggered a DFR, and the Standards should have been withdrawn.**

   **A.**   **The DFR process was historically limited to noncontroversial rules, with any adverse comment sufficient to cause withdrawal.**

Congress did not create the EPCA DFR process out of whole cloth. Rather, direct final rulemaking was invented by EPA for noncontroversial revisions to state implementation plans ("SIPs") under the Clean Air Act. *See* Michael Kolber, *Rulemaking Without Rules: An Empirical Study of Direct Final Rulemaking*, 72 Alb. L. Rev. 79, 89

(2009); *see also* 46 Fed.Reg. 44476, 44477 (Sept. 4, 1981). EPA explained at the time: "Because of the straight-forward nature of some actions or the narrowness of their scope, many SIP revisions get few, if any, comments from the public during the comment period." 46 Fed.Reg. at 44477. Accordingly, EPA proceeded to issue DFRs it believed were noncontroversial, but announced that if it "received notice that someone wishes to submit adverse or critical comments, the action will be withdrawn." *Id.*

EPA's experiment was successful. In 1994, the Administrative Conference of the United States ("ACUS") accordingly recommended "use of 'direct final' rulemaking where appropriate to eliminate double review of noncontroversial rules." 59 Fed.Reg. 4669, 4673 (Feb. 1, 1994). Following EPA's lead, ACUS explained that "[d]irect final rulemaking involves issuing a rule for notice and comment, with an accompanying explanation that if the agency receives no notices during the comment period that any person intends to file an adverse comment, the rule will become effective 30 days (or some longer period) after the comment period closes." *Id.*

A year later, ACUS provided more detailed recommendations. It explained "[t]he direct final rulemaking process is based upon the notion that receipt of [a] 'significant adverse' comment will prevent the rule from automatically becoming final." 60 Fed.Reg. 43108 (Aug. 18, 1995). ACUS recommended that a "significant adverse comment" be defined as "one where the commenter explains why the rule would be inappropriate, including challenges to the rule's underlying premise or approach...." *Id.* "In determining whether a significant adverse comment is sufficient to terminate a direct final rulemaking, agencies should consider whether the comment raises an issue serious enough to warrant a substantive response in a notice-and-comment process." *Id.*

By 2005, DOE contemplated DFRs in the context of EPCA efficiency standards. Indeed, in response to an EPCA advance notice of proposed rulemaking, a group of stakeholders submitted a set of joint comments and asked the agency to proceed via DFR. 70 Fed.Reg. 7673 (Feb. 15, 2005). Laying out the process, DOE explained a DFR "is appropriate only for rules for which significant adverse comment is considered unlikely," and it "would publish a timely notice of withdrawal ... before the effective

date … and proceed with the [traditional rulemaking process] if it receives significant adverse public comments." *Id.* at 7674.

## B. EPCA requires true consensus, and a DFR "*shall*" be withdrawn if a comment merely "*may* provide a reasonable basis" for doing so.

As that background makes clear, EPCA's DFR provisions were not written on a blank slate. Rather, the process was long understood to be appropriate only when there was true consensus and no substantive objection. Where, as here, "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022); *see also*, *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 301 (2015) (applying doctrine to administrative law term of art that was used in a statute).

**1.** In DOE's proposed legislation, a "joint statement" by "interested persons fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates)" was required in order to permit a DFR. Dkt. 42-2. Consistent with the historical requirement for consensus, DOE stated its proposal would apply only "in the absence of apparent stakeholder objection." *Id.* Congress enacted that part of DOE's proposal verbatim. 42

U.S.C. § 6295(p)(4). Having used a term of art and having told Congress that—consistent with that term's established usage—DOE understood direct final rulemaking as requiring consensus and the absence of objection, DOE should not be heard to adopt a different meaning now.

**2.** The requirement for consensus is reinforced by the statute's broad withdrawal requirement. DOE's proposal tracked the ACUS recommendation and called for a DFR to be withdrawn if the agency "receives one or more significant and legally relevant public comments." Dkt. 42-2. But Congress did not adopt that language. Congress instead directed "the Secretary *shall* withdraw" the DFR if DOE merely "receives 1 or more adverse public comments" and "such adverse public comments … *may* provide a reasonable basis for withdrawing the direct final rule." 42 U.S.C. § 6295(p)(4)(C) (emphasis added).

On its face, the statute provides that an adverse comment need not actually establish a basis for withdrawing the DFR. It's enough that the comment "may" establish a reasonable basis for withdrawal, *i.e.*, it's enough that there is the contingency or possibility of doing so. *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 411 (1914); *see also United States v. ALCOA*, 377 U.S. 271, 280 (1964) ("Congress used the

words '*may* be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties."). That construction is reinforced when the contingency in the withdrawal requirement is read against a different paragraph requiring that facts be "established by a preponderance of the evidence," *i.e.*, a specific standard of certainty. 42 U.S.C. § 6295(o)(4); *see also Miss. Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1364 (5th Cir. 1993) ("The use of different words or terms within a statute indicates that Congress intended to establish a different meaning for those words.").

### C. The Joint Agreement is a settlement agreement by parties that are not fairly representative; it is not a non-controversial efficiency standard.

Understanding what the Joint Agreement is illuminates why it fails under EPCA's direct final rule provisions. The document is unusual. It covers multiple appliances that—like cooking products—have been the subject of contentious rulemaking processes. It was expressly submitted "as a complete package," *i.e.* "each part of [the] agreement [was] contingent upon the other parts being implemented." ARID.164. And with respect to cooking products, AHAM nakedly reversed its position

that no significant changes had occurred to justify new standards since the April 2009 Final Rule. *See* 88 Fed. Reg. at 6828.

The reason for AHAM's reversal is readily inferred: the Joint Agreement was submitted after DOE proposed an efficiency standard that industry concluded would eliminate most gas cooking products. And the signatories consisted only of industry and activists who had historically supported increased efficiency standards—some of whom had previously sued DOE over the delay—without any of the other stakeholders who historically opposed higher efficiency standards. The inference is that industry was strong-armed with a threat of disastrous overregulation. Indeed, the "Joint Agreement" has hallmarks of a master settlement agreement to avoid that outcome, not a consensus on non-controversial standards.

### D. The Petitioner States' adverse comments should have triggered withdrawal of the Standards.

Not surprisingly, *twenty-three States* submitted a comment calling into doubt whether the Joint Agreement was submitted by persons "fairly representative of the relevant points of view," as EPCA requires. ARID.187. The objecting States noted that many of the Joint Agreement signatories had no apparent expertise in cooking products,

but were instead simply environmental activists. The States also noted unresolved concerns with the cost of the rule and its impact on low-income Americans. And they urged that EPCA requires a consensus of States across the ideological spectrum for DOE to proceed with a direct final rule, but the Joint Agreement instead appeared to be an "ideologically motivated attack." *Id.* The objecting States' criticism was blunt: "DOE cannot cherry pick the States with which it is aligned to circumvent the ordinary rulemaking process." *Id.* DOE's "[d]oing so fails the 'fairly representative' requirement to issue a direct final rule." *Id.*

More substantively, the objecting States also called out AHAM's sudden reversal of position, as well as DOE's failure to address significant industry comments submitted in response to the 2023 SNOPR. ARID.187. DOE's response was blithe: DOE claimed the States "misunderstood DOE's direct final rule authority," "the 2024 Direct Final Rule is a separate rulemaking … from DOE's prior rulemaking in the February 2023 SNOPR, and DOE has no obligation to consider comments submitted in response to that prior rulemaking." 89 Fed.Reg. 65531-32.

Setting aside that the States conveyed the substance of those comments in their own comment, DOE elsewhere said it "did consider

relevant comments … obtained during that [putatively other] rulemaking process." 89 Fed.Reg. at 11444. And DOE has now included them in the administrative record. ARID.115, ARID.136, ARID.137. The actual misunderstanding is thus DOE's: rulemaking is not a choose-your-own-administrative-record adventure. *See In re United States*, 583 U.S. 1029, 1030-33 (2017). DOE's actions were arbitrary and capricious both because they are internally inconsistent as to what DOE claims to have reviewed, *see Chamber of Commerce of the U.S. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018), and because DOE failed to respond to the substantive industry comments that were called to its attention, *see Chamber of Commerce of the U.S. v. Dep't of Labor*, 85 F.4th 760, 774, 780 (5th Cir. 2023).

In short, the objecting States urged the Joint Agreement did not comply with the statutory requirement that the signatories be "fairly representative" in view of the carefully curated support and widespread opposition. And under any reasonable construction of the statute, the widespread opposition reflected by 23 states objecting should have satisfied the low burden of the mandatory withdrawal provision. Likewise the States' calling out DOE's failure to address industry's

about-face and failure to respond to industry comments DOE claimed to have reviewed. DOE's refusal to withdraw the Standards thus violated EPCA and—by extension—the APA.

## II. DOE failed to consider the impact of the Standards on product lifespan.

Montana and Utah provided additional technical comments that called the Standards into doubt, particularly the impact of the Standards on reliability and product lifespan.

**1.** To analyze whether efficiency standards satisfy the economic justification requirement of EPCA, DOE looks at the life-cycle cost ("LCC") of the product. DOE explained: "EPCA requires DOE to consider the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered product that are likely to result from a standard." 89 Fed.Reg. at 11447 (citing 42 U.S.C. § 6295(o)(2)(B)(i)(II)). For the Standards at issue, DOE estimated the average lifetime to be 16.8 years for all electric cooking products and 14.5 years for all gas cooking products. 89 Fed.Reg. at 11477.

Utah and Montana cast doubt on that assumption. They explained that as a matter of basic engineering principles, "[i]ncreased energy efficiency in the use phase tends to increase appliance complexity, decrease component and overall robustness, and decrease engineering margins." ARID.190. "As the number of parts, the complexity of those parts, and overall complexity increase, while engineering margins decrease, overall mean time between failures (MTBF, for repairable devices) and mean time to failure (MTTF, for nonrepairable devices) decrease." *Id.* The States supported their comment by attaching undergraduate engineering texts making those very points. *E.g.* ARID.190 Exh. E ("One of the reasons why the problem of reliability arises is the exceptional complexity of modern automatic systems. A decrease of system complexity can substantially increase the system reliability.").

Concern with lifespan is particularly appropriate here, where DOE considered and rejected a prescriptive standard banning "rugged" and "reliable" linear power supplies in 2009, 88 Fed.Reg. at 6847, and has correctly noted that "the greater complexity of [alternatives] may also lower overall reliability," 77 Fed.Reg. 8526, 8538 (Feb. 14, 2012). Despite

its own statements, DOE dismissed the States' concerns with reliability as "theoretical conjecture;" carefully stated that "no real-world evidence or data related to the technologies used at the adopted standard levels can be found *clearly supporting* such a correlation;" then faulted the States for not providing such data. DOE in turn concluded the States' not providing data meant their comment "does not provide a reasonable basis for withdrawal." 89 Fed.Reg. at 65526, 65527.

As an initial error, DOE misapprehended the low standard for withdrawal: it was enough that the States's objection "may" provide a reasonable basis for withdrawal; certainty wasn't required. On the merits, DOE's carefully-worded rejoinder proves too much. It's an implicit concession there is data; it just doesn't suit DOE's arbitrary taste for this rulemaking.

Indeed, a commenter on the 2023 SNOPR pointed DOE to a military handbook and an industrial reliability guide as evidence that alternatives to linear power supplies are not as reliable as linear power supplies, and that those alternatives "are degrading lifetimes due to more complex electronic controls, [switching power supplies], and light-weighting," 89 Fed.Reg. at 11453, *i.e.*, essentially the same point the

States made by referencing engineering textbooks.[1] So DOE moved the goalpost. As DOE would have it, neither engineering textbooks explaining reliability nor data about component reliability are enough. Rather, to satisfy DOE's subjective taste, data must be "related to the technologies used at the adopted standard levels," and it must meet DOE's undisclosed standards for "clearly" supporting the point.

The Standard thus falls into internal inconsistency. DOE relies on refrigerator data, for example, to support the Standards, 89 Fed. Reg. at 11475, but DOE demands adverse commenters supply data specific to

---

[1] One of the data sources the commenter pointed to is MIL-HDBK-217, 89 Fed.Reg. at 11453 n.33, a publication providing methods of calculating failure rates, together with supporting data. The Defense Logistics Agency states:

> The purpose of this handbook is to establish and maintain consistent and uniform methods for estimating the inherent reliability (i.e., the reliability of a mature design) of military electronic equipment and systems. It provides a common basis for reliability predictions during acquisition programs for military electronic systems and equipment. It also establishes a common basis for comparing and evaluating reliability predictions of related or competitive designs.

Defense Logistics Agency, MIL-HDBK-217, quicksearch.dla.mil/qsDocDetails.aspx?ident_number=53939. The U.S. Navy most recently validated MIL-HDBK-217 in June 2022.

cooking products operating at the level set by the Standards to call the Standards into doubt. Such "internal inconsistency [is] characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce*, 885 F.3d at 382. More to the point: if the data is so unclear, why did DOE reject efficiency standards in 2009, repeatedly propose rejecting such standards over the following decade, and repeatedly note reliability concerns with alternatives to linear power supplies in doing so?

In view of those past positions, it was DOE's burden to establish that technology had advanced in a way that would justify its change in position. The APA "demand[s] that [DOE] display awareness that it *is* changing position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), which it failed to do. Indeed, DOE was obligated to "provide a 'detailed justification' for its change when [as here] its new policy rests upon factual findings that contradict those which underlay its prior policy...." *Id.* That DOE's new position is contrary to textbook engineering expectations can only reinforce that obligation. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998) ("EPA retains a duty to examine key assumptions as part of its

affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule.").

Drilling further down, DOE's response to Utah and Montana reflects yet another layer of arbitrariness. Historically where, as here, there was "no serious effort to confirm [a DOE] assumption through empirical study," the resulting agency action must be set aside. *NRDC, Inc. v. Herrington*, 768 F.2d 1355, 1398 (D.C. Cir. 1985). More recent authority softened that rule, but an agency still cannot ignore data it possesses. *Chamber of Commerce*, 85 F.4th at 774-76. Accordingly, when DOE's assumptions about product lifespan were called into question in a previous EPCA rulemaking, DOE performed a sensitivity analysis to test the impact. 81 Fed.Reg. 65720, 65786 (Sept. 23, 2016). But DOE didn't do that here, despite conceding LCC benefit is as low as $3.09, and despite large, unexplained *increases* in putative LCC benefit for the same standards as compared to the 2023 SNOPR.[2] The unexplained increase

---

[2] Putative LCC savings in the 2023 SNOPR were $13.29 for electric smooth element cooking tops, but rose to $62.80 in the 2024 Standards, despite the standards being identical. Similarly, LCC savings rose from $0.95 - $1.02 for electric ovens and $0.59 - $0.65 for gas ovens in the 2023

strongly suggests LCC benefit is being driven by something other than energy savings. And with LCC benefits as trivial as $3.09, even a small reduction in lifespan could render the LCC negative. But yet again, DOE didn't acknowledge that it was changing how it analyzed questions about lifespan, let alone explain that change. The "agency cannot merely flit serendipitously from case to case, like a bee buzzing from flower to flower, making up the rules as it goes along." *Noranda Alumina, LLC v. Perez*, 841 F.3d 661, 665 (5th Cir. 2016).

**2.** The impact of increased complexity was ignored in other parts of DOE's analysis, too. For example, DOE assumed "repair costs remain the same in the no-new-standards and standards cases leading to no additional repair cost as a result of a standard." At a minimum, that, too, is inconsistent with DOE's prior rejection of banning linear power supplies in view of reliability concerns with alternatives.

---

SNOPR to $16.23 and $15.17, respectively, in the 2024 Standards, despite the standards being the same prescriptive restriction on linear power supplies. *Compare* 88 Fed.Reg. at 6820 *with* 89 Fed.Reg. at 11437. That strongly suggests the putative LCC savings were overwhelmingly driven by something other than energy efficiency.

**3.** More broadly, reliability and lifespan permeate the question of energy efficiency. As DOE elsewhere acknowledged: "[C]onscientious energy use is critical," but "the issue can be more complicated than just increasing efficiency[.]" ARID.190 Exh. A. That's because vast amounts of energy are required to mine and refine raw materials, deliver those materials to a factory, manufacture a product, then deliver that finished product to a consumer. Indeed, DOE officials have testified, for example, that "a large part of the carbon footprint for many consumer products can be attributed to the supply chain—from raw materials, transport, and packaging to the energy consumed in manufacturing processes—on the order of 40 to 60 percent." ARID.190 Exh. B. So "it is relevant to address not only [energy consumption in] the use phase but also other phases of the life cycle, especially the production phase." ARID.190 Exh. C.

Overall energy use is thus intimately tied to lifespan and reliability. Lifespan, because so much energy is expended in producing a replacement product. And reliability, because consumers tend not to make significant repairs as products near end of life; they replace the product in toto. *See* 65 Fed.Reg. 59590, 59601 (Oct. 5, 2010). Put succinctly: the lifespan of unreliable products tends to be shorter. DOE

"cannot simply ignore [such] 'an important aspect of the problem'" as lifespan. *Ohio v. EPA*, 603 U.S. 279, 281 (2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The objecting States raised that concern with DOE, but DOE gave yet another blithe response: "Neither the energy use nor the energy efficiency of a product, as those terms are defined in EPCA, is dependent upon the lifespan of the product." 89 Fed.Reg. at 65524 (referencing 42 U.S.C. § 6291(4)). Of course, EPCA's economic justification factors are dependent on lifespan, including "the economic impact of the standard … on the consumers of the product," "the savings in operating costs throughout the estimated average life of the covered product," and "the need for national energy and water conservation." 42 U.S.C. § 6295(o)(2)(B). And under "other factors," DOE considered "reduction in emissions, and the need to confront the global climate crisis," *i.e.*, factors that do implicate lifespan and replacement given the huge contribution of manufacturing and shipping.

To illustrate: imagine a stove that used half the energy of any other stove, but had a lifespan of only a single day. No one would say that stove was energy efficient or economical. The example is extreme, but the point

is sound. DOE promulgated the Standards on the basis of miniscule economic benefits. It's doing so was a reversal of its prior position that efficiency standards were not economically justified, and it required DOE to ignore its own repeated statements about the reliability of the components in was mandating. But given the massive energy use in replacing a product, the energy use attributable to even a small decrease in lifespan could dwarf the miniscule savings DOE claims. DOE's failure to consider that aspect of the problem was arbitrary and capricious. At a minimum, it "may provide a reasonable basis" for withdrawing the Standards.

## CONCLUSION

For the foregoing reasons, the Court should hold that DOE's refusal to withdraw the 2024 Standards violated EPCA and the APA, and the 2024 Standards should be held unlawful and set aside.

Dated: February 5, 2025

Respectfully submitted,

**AUSTIN KNUDSEN**
  **ATTORNEY GENERAL**

CHRISTIAN CORRIGAN
  *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
MONTANA DEPT. OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*/s/ Joseph S. St. John*
Joseph S. St. John
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
(410) 212-3475
scott@stjohnlaw.com

*Counsel for State of Montana*

**LYNN FITCH**
  **ATTORNEY GENERAL**

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

**LIZ MURRILL**
  **ATTORNEY GENERAL**

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
  *Solicitor General*
LOUISIANA DEPT. OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*

KEN PAXTON
  ATTORNEY GENERAL

BRENT WEBSTER
  *First Assistant*
  *Attorney General*

AARON L. NIELSON
  *Solicitor General*

/s/ *William F. Cole*
WILLIAM F. COLE
  *Deputy Solicitor General*
OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700
william.cole@oag.texas.gov

*Counsel for State of Texas*


DEREK BROWN
  ATTORNEY GENERAL

/s/ *Stanford Purser*
Stanford Purser
  *Solicitor General*
OFFICE OF THE UTAH
  ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111

*Counsel for State of Utah*

MICHAEL T. HILGERS
  ATTORNEY GENERAL

/s/ *Zachary B. Pohlman*
ZACHARY B. POHLMAN
  *Assistant Solicitor General*
NEBRASKA DEPT. OF JUSTICE
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2683
zachary.pohlman@nebraska.gov

*Counsel for State of Nebraska*


JONATHAN SKRMETTI
  ATTORNEY GENERAL

J. MATTHEW RICE
  *Solicitor General*

/s/ *Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER
  *Director of Strategic Litigation*
OFFICE OF THE TENNESSEE
  ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
whitney.hermandorfer@
  ag.tn.gov

*Counsel for State of Tennessee*

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2025, I electronically filed the above with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joseph S. St. John

**CERTIFICATE OF COMPLIANCE**

As required by Federal Rule of Appellate Procedure 32(f) and (g), I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7), because it contains 6,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word.

*/s/ Joseph S. St. John*