No. 24-60529

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF UTAH,

Petitioners,

v.

DEPARTMENT OF ENERGY,

Respondent.

———————————

On Petition for Review from the United States Department of Energy

———————————

## BRIEF FOR RESPONDENT

———————————

*Of Counsel:*

DAVID R. TAGGART
*Acting General Counsel*

BRENT ALLEN
*Deputy General Counsel for Environment
and Litigation*

*Department of Energy*

YAAKOV M. ROTH
*Acting Assistant Attorney General*

MICHAEL S. RAAB
SARAH N. SMITH
*Attorneys, Appellate Staff
Civil Division, Room 7533
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-0173*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as respondent is a government agency.  5th Cir. R. 28.2.1.

*s/ Sarah N. Smith*
Sarah N. Smith

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners seek vacatur of a final rule issued by the Department of Energy and have requested oral argument. The government does not believe that oral argument is necessary in this case but stands ready to present argument if it would assist the Court in its deliberations.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES .................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

    A.    Statutory Background .................................................................. 2

    B.    Regulatory and Procedural Background ..................................... 4

SUMMARY OF ARGUMENT ....................................................................... 7

STANDARD OF REVIEW ............................................................................ 9

ARGUMENT ............................................................................................... 10

I.    The Petition Should Be Dismissed for Lack of Jurisdiction. ............. 10

II.    DOE Was Not Required to Withdraw the Direct Final Rule. ............ 18

    A.    DOE need not withdraw a direct final rule merely because the agency receives adverse comments. ......................................... 19

    B.    Petitioners' comments did not provide a reasonable basis for withdrawing the direct final rule. ............................................. 20

        1.    The Joint Agreement's sponsors are fairly representative of relevant points of view. ................................................... 21

        2.    DOE was not required to respond to comments that were submitted in a separate 2023 rulemaking. ...................... 25

        3.    DOE reasonably determined that the direct final rule's standards will not make affected products less reliable. .............. 28

CONCLUSION ............................................................................................ 34

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................. 14

*City of Arlington v. FCC*,
   668 F.3d 229 (5th Cir. 2012) ........................................... 11-12, 16

*Hinojosa v. Horn*,
   896 F.3d 305 (5th Cir. 2018) ............................................... 18

*Milice v. Consumer Prod. Safety Comm'n*,
   2 F.4th 994 (D.C. Cir. 2021) ........................................... 11, 14

*Morales v. Sessions*,
   860 F.3d 812 (5th Cir. 2017) ............................................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ............................................................... 9

*Natural Res. Def. Council v. Abraham*,
   355 F.3d 179 (2d Cir. 2004) .............................................. 10

*Natural Res. Def. Council v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) ........................................... 10-11, 16

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .............................................................. 12

**Statutes:**

Administrative Procedure Act (APA):
   5 U.S.C. § 704 ................................................................... 18
   5 U.S.C. § 706(2)(A) ............................................................. 9

Energy Independence and Security Act of 2007,
   Pub. L. No. 110-140, § 308, 121 Stat. 1492, 1560-61
   (codified at 42 U.S.C. § 6295(p)(4)) ..................................... 3

Energy Policy and Conservation Act (EPCA):
   42 U.S.C. § 6295 ........................................................... 7, 10
   42 U.S.C. § 6295(h) ............................................................. 2
   42 U.S.C. § 6295(m)(1) ......................................................... 2

42 U.S.C. § 6295(o) .............................................................. 5, 24

42 U.S.C. § 6295(o)(1) ........................................................... 3

42 U.S.C. § 6295(o)(2)(A) ............................................... 2, 24, 29

42 U.S.C. § 6295(o)(2)(B)(i)(II) ............................................ 29

42 U.S.C. § 6295(o)(3)(B) ...................................................... 2

42 U.S.C. § 6295(p)(4) ................................................... 4, 13, 14

42 U.S.C. § 6295(p)(4)(A) ....................................... 2, 3, 6, 21, 22

42 U.S.C. § 6295(p)(4)(A)(i) ............................................. 3, 13

42 U.S.C. § 6295(p)(4)(B) ...................................................... 3

42 U.S.C. § 6295(p)(4)(C) .............................................. 3, 6, 12

42 U.S.C. § 6295(p)(4)(C)(i) .......................................... 15, 20

42 U.S.C. § 6295(p)(4)(C)(i)(I) ........................................... 19

42 U.S.C. § 6295(p)(4)(C)(i)(II) ...................................... 19, 24

42 U.S.C. § 6295(p)(4)(C)(iii) ............................................. 13

42 U.S.C. § 6303 ................................................................. 14

42 U.S.C. § 6306(b) ................................................... 1, 7, 10

42 U.S.C. § 6306(b)(1) .......................................... 4, 7, 10, 11

42 U.S.C. § 6306(b)(2) .......................................... 4, 9, 11, 16

42 U.S.C. § 6316(a)(1) ......................................................... 10

28 U.S.C. § 1631 ............................................................... 18

28 U.S.C. § 2342 ............................................................... 12

28 U.S.C. § 2344 ............................................................... 12

49 U.S.C. § 32909(b) .......................................................... 16

**Legislative Material:**

*Achieving—At Long Last—Appliance Efficiency Standards,*
   *Hearing Before the H. Subcomm. on Energy and Air Quality,*
   *Comm. On Energy and Commerce*, 110th Cong. (2007) .................................. 23

**Other Authorities:**

Energy Conservation Program: Energy Conservation Standards
   for Certain Consumer Products (Dishwashers, Dehumidifiers,
   Electric and Gas Kitchen Ranges and Ovens, and Microwave Ovens)
   and for Certain Commercial and Industrial Equipment
   (Commercial Clothes Washers), 73 Fed. Reg. 62,034 (Oct. 17, 2008) .................... 31

Energy Conservation Program: Energy Conservation Standards
    for Consumer Conventional Cooking Products,
    88 Fed. Reg. 6818 (Feb. 1, 2023) ........................................................ 4, 25, 27

Energy Conservation Program: Energy Conservation Standards
    for Consumer Conventional Cooking Products,
    89 Fed. Reg. 11,434 (Feb. 14, 2024) ............. 1, 5, 6, 14, 17, 22, 25, 26, 27, 29, 30, 32

Energy Conservation Program: Energy Conservation Standards
    for Consumer Conventional Cooking Products,
    89 Fed. Reg. 11,548 (Feb. 14, 2024) ............................................................. 5

Energy Conservation Program: Energy Conservation Standards
    for Consumer Conventional Cooking Products,
    89 Fed. Reg. 65,520 (Aug. 12, 2024) .................................... 1, 6, 7, 12, 13, 17, 22, 23,
                                    24, 26, 27, 28, 30, 31, 32, 33

## STATEMENT OF JURISDICTION

Petitioners are a group of States that seek judicial review of a direct final rule published on February 14, 2024, by the Department of Energy (DOE). Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products, 89 Fed. Reg. 11,434 (Feb. 14, 2024) (*Direct Final Rule*). Petitioners also seek judicial review of a notice published in the Federal Register on August 12, 2024, which confirmed the effective and compliance dates of the direct final rule. Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products, 89 Fed. Reg. 65,520 (Aug. 12, 2024) (*Confirmation Notice*). Petitioners filed the petition for review on October 11, 2024, invoking this Court's jurisdiction under 42 U.S.C. § 6306(b).[1] As explained below, this Court lacks jurisdiction to review the direct final rule because the petition was filed more than 60 days after the rule was "prescribed," 42 U.S.C. § 6306(b), and the Court lacks jurisdiction to review the confirmation notice because petitioners lack Article III standing to challenge the notice.

## STATEMENT OF THE ISSUES

The Energy Policy and Conservation Act directs DOE to periodically conduct rulemakings to determine whether to amend energy efficiency standards for certain consumer products. The Department may bypass regular rulemaking and amend

---

[1] The petition is dated October 10, 2024, but is stamped as received on October 11, 2024.

efficiency standards through direct final rule upon receipt of a joint proposal from a group of stakeholders "that are fairly representative of relevant points of view." 42 U.S.C. § 6295(p)(4)(A). DOE received a joint statement proposing new and amended standards for conventional cooking products (*i.e.*, cooking tops and ovens), and subsequently issued a direct final rule adopting the proposed standards.

The issues presented for review are:

1. Whether this Court has jurisdiction over the petition.

2. Whether DOE was required to withdraw the direct final rule in response to petitioners' comments opposing the rule.

## STATEMENT OF THE CASE

### A.     Statutory Background

1. The Energy Policy and Conservation Act (EPCA) directs the Department of Energy to periodically conduct rulemakings to determine whether to amend energy conservation standards for certain consumer products, including kitchen ranges and ovens. 42 U.S.C. § 6295(h), (m)(1). When DOE issues a new or amended energy standard pursuant to this authority, it must ensure that the standard is "designed to achieve the maximum improvement in energy efficiency . . . which the Secretary determines is technologically feasible and economically justified." *Id.* § 6295(o)(2)(A). EPCA prohibits DOE from prescribing a new or amended standard that "will not result in significant conservation of energy." *Id.* § 6295(o)(3)(B). The Act also contains an anti-backsliding provision, which prohibits DOE from "prescib[ing] any

2

amended standard which increases the maximum allowable energy use, . . . or decreases the minimum required energy efficiency, of a covered product." *Id.* § 6295(o)(1).

2. In 2007, Congress amended EPCA to give DOE authority to amend energy conservation standards by issuing direct final rules, thereby expediting the rulemaking process. Energy Independence and Security Act of 2007, Pub. L. No. 110-140, § 308, 121 Stat. 1492, 1560-61 (codified at 42 U.S.C. § 6295(p)(4)). Upon receipt of a joint proposal from a group of "interested persons that are fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates), as determined by the Secretary," DOE may issue a direct final rule establishing an energy efficiency standard if the Secretary determines that the proposed standard satisfies the requirements of § 6295(o). 42 U.S.C. § 6295(p)(4)(A). The direct final rule "is published simultaneously with a notice of proposed rulemaking" that proposes an identical standard. *Id.* § 6295(p)(4)(A)(i).

The Department must then provide a public comment period of at least 110 days. 42 U.S.C. § 6295(p)(4)(B). No later than 120 days after the date on which the rule is published, the Secretary must withdraw the rule and proceed with the notice of proposed rulemaking if the Department receives any adverse comment that "the Secretary determines . . . may provide a reasonable basis for withdrawing the direct final rule," based on the rulemaking record and specified statutory provisions. *Id.* § 6295(p)(4)(C). If the Secretary does not withdraw the rule, it becomes effective as

3

specified in the original issuance of the direct final rule. EPCA does not require the Department to take any other action following its decision not to withdraw a direct final rule. *See id.* § 6295(p)(4).

**3.** A DOE final rule prescribing an energy conservation standard is subject to judicial review directly in the court of appeals. Any person adversely affected by a rule prescribed under § 6295 may, "at any time within 60 days after the date on which such rule is prescribed," file a petition for review of the rule in the United States courts of appeals. 42 U.S.C. § 6306(b)(1). Upon the filing of a petition described in § 6306(b)(1), the court of appeals "shall have jurisdiction to review the rule." *Id.* § 6306(b)(2).

**B.    Regulatory and Procedural Background**

1. In 2023, DOE published a supplemental notice of proposed rulemaking proposing new and amended efficiency standards for cooking products. Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products, 88 Fed. Reg. 6818 (Feb. 1, 2023). While that rulemaking was underway, DOE received a joint statement recommending different efficiency standards for cooking products from a trade association representing manufacturers, energy and environmental advocates, consumer groups, and a gas and electric utility. ARID.164 (Joint Agreement). The States of California, New York, and Massachusetts helped negotiate the recommended standards and submitted a separate letter in

support of the Joint Agreement.  ARID.164, at 3; ARID.165.  Two additional utility

companies also submitted a letter in support.  ARID.166.

After determining that the Joint Agreement satisfied the requirements of 42

U.S.C. § 6295(p)(4) and that the recommended standards met the criteria of 42 U.S.C.

§ 6295(o), DOE issued a direct final rule adopting the Joint Agreement's

recommended standards for cooking products, with an effective date of June 13,

2024.  *Direct Final Rule*, 89 Fed. Reg. at 11,445, 11,434.  The rule sets performance-

based standards for conventional cooking tops in terms of maximum integrated

annual energy consumption, and it prohibits conventional ovens from being equipped

with a control system that uses a linear power supply, starting January 31, 2028.  *Id.* at

11,435-36.  As EPCA requires, DOE simultaneously published a notice of proposed

rulemaking proposing identical standards.  Energy Conservation Program: Energy

Conservation Standards for Consumer Conventional Cooking Products, 89 Fed. Reg.

11,548 (Feb. 14, 2024).

The Department accepted public comments for a period of 110 days.  *Direct

Final Rule*, 89 Fed. Reg. at 11,435.  Petitioner Nebraska, joined by 22 other States,

commented that the Joint Agreement did not satisfy EPCA's standard for

representativeness because it was not supported by States across the ideological

spectrum.  ARID.187, at 6.  Nebraska also faulted the direct final rule for not

addressing concerns raised by manufacturers in the 2023 rulemaking.  ARID.187, at 2-

4.  Petitioner Utah, joined by Montana, commented that DOE failed to consider the

amended standards' impact on product reliability and lifespan.  ARID.190, at 2-4.

The deadline for DOE to withdraw the rule passed on June 13, 2024.  *See* 42 U.S.C.

§ 6295(p)(4)(C).  DOE did not withdraw the direct final rule.

2.  Two months later, on August 12, 2024, DOE published a notice in the

Federal Register that summarized the comments DOE received during the comment

period and its responses to those comments.  *Confirmation Notice*, 89 Fed. Reg. at

65,521.  Although a confirmation notice is "not required under EPCA," it has been

DOE's typical practice to publish such a notice when DOE does not withdraw a

direct final rule following the statutory comment period.  *Id.*  The notice also

"confirm[ed] the effective and compliance dates" for the standards, which had been

established in the direct final rule.  *Id.* at 65,520; *see also Direct Final Rule*, 89 Fed. Reg.

at 11,434.

The confirmation notice explained why petitioners' comments did not provide

a reasonable basis to withdraw the direct final rule.  The agency rejected Nebraska's

assertion that a joint proposal must enjoy the support of States from across the

ideological spectrum.  DOE noted the lack of textual support for petitioners' position

and explained that EPCA does not require consensus but vests discretion in the

Secretary to determine when a joint proposal is "fairly representative" of relevant

points of view.  *Confirmation Notice*, 89 Fed. Reg. at 65,530-31 (quoting 42 U.S.C.

§ 6295(p)(4)(A)).  DOE also responded to Nebraska's criticism that it failed to address

industry concerns that were raised in the 2023 rulemaking, explaining that the 2024

direct final rule was a separate rulemaking, conducted under separate statutory authority, and so DOE was not obligated to address comments submitted in the 2023 rulemaking. *Id.* at 65,531-32. Notwithstanding the fact that it was not obligated to do so, DOE did in fact address the comments petitioners identified. *Id.* at 65,532. Finally, DOE rejected Utah's comment regarding product reliability and lifespan as unsupported. The agency pointed to industry data and comments indicating that higher-efficiency cooking products are no less reliable than their baseline counterparts. *Id.* at 65,526-27.

3. On October 11, 2024, petitioners filed a petition for review of the direct final rule and the confirmation notice, invoking this Court's jurisdiction under 42 U.S.C. § 6306(b). Pet. 1-2. The government filed a motion to dismiss for lack of jurisdiction, arguing that petitioners lack Article III standing to challenge the confirmation notice, as it has no legal effect, and that their petition seeking review of the direct final rule was filed outside of the 60-day deadline provided in 42 U.S.C. § 6306(b)(1). The Court ordered that the motion be carried with the case. *See* Order 1, Dec. 19, 2024.

## SUMMARY OF ARGUMENT

**I.** The petition should be dismissed for lack of jurisdiction. This Court has jurisdiction to review rules prescribed under 42 U.S.C. § 6295, but only if a petition seeking review of such a rule is filed within 60 days of the rule being prescribed. 42 U.S.C. § 6306(b). The petition here was filed eight months after the direct final rule

was published—well beyond § 6306(b)'s 60-day deadline. This Court also lacks jurisdiction to review the confirmation notice because petitioners lack standing. The confirmation notice—which was not required by EPCA—has no legal effect, and so it works no harm on petitioners and an order by this Court vacating the notice could not redress any injury they allegedly suffer.

**II.** If the Court reaches the merits, it should deny the petition. Congress amended EPCA to grant DOE unique direct final rulemaking authority. DOE is not required to withdraw a direct final rule amending energy efficiency standards merely because it receives adverse comments. Rather, withdrawal is only required when DOE receives at least one adverse comment that the Secretary determines provides a reasonable basis to withdraw the rule based on the rulemaking record.

DOE correctly determined that petitioners' comments did not meet that standard. First, petitioners commented that the Joint Agreement was not submitted by a "fairly representative" group of stakeholders because it was not supported by States of opposing political views. That argument is inconsistent with EPCA's text, which says nothing of States' ideology but rather ensures a diversity of views by requiring the participation of stakeholders with different interests on the issue of energy efficiency, as determined by DOE. Petitioners' interpretation is also inconsistent with Congress's purpose in granting DOE direct final rulemaking authority, which was to encourage stakeholders to agree to negotiated standards to accelerate rulemaking.

Second, petitioners critiqued the direct final rule for not addressing concerns raised by industry in a separate 2023 rulemaking. But DOE was not required to address comments submitted in a separate rulemaking that was conducted under different legal authority. In any case, the agency did address the industry comments petitioners identify in the direct final rule.

Finally, petitioners accused DOE of failing to consider the amended standards' effect on product reliability and lifespan. Relying on general engineering principles, petitioners hypothesized that because higher-efficiency products are more complex, they would be less reliable and would not last as long as baseline products. DOE reasonably concluded that petitioners' comment was unsupported, in view of data and comments from manufacturers indicating that the amended standards could be achieved using technologies that are readily available and do not reduce product reliability.

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), a final rule setting energy conservation standards may be held unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 42 U.S.C. § 6306(b)(2) (rules prescribed under § 6295 are to be reviewed in accordance with the APA). Review under that standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). EPCA further provides that rules promulgated under

§ 6295 must be supported by substantial evidence. 42 U.S.C. §§ 6306(b), 6316(a)(1).

Under the "substantial evidence" standard, an agency's action must be upheld unless

"the evidence both supports and compels a contrary result." *Morales v. Sessions*, 860

F.3d 812, 818 (5th Cir. 2017).

## ARGUMENT

### I.     The Petition Should Be Dismissed for Lack of Jurisdiction.

**1.** Petitioners seek judicial review of the direct final rule, which was issued on

February 14, 2024, and the confirmation notice confirming the effective and

compliance dates of that rule, which was published on August 12, 2024. The Court

lacks jurisdiction to review the rule because petitioners filed their petition outside the

60-day limit prescribed by 42 U.S.C. § 6306(b)(1). The Court also lacks jurisdiction to

review the confirmation notice because petitioners lack Article III standing.

Accordingly, the petition should be dismissed.

**a.** A person adversely affected by a rule prescribed under 42 U.S.C. § 6295

"may, at any time within 60 days after the date on which such rule is prescribed," file a

petition for review in the court of appeals. 42 U.S.C. § 6306(b)(1). For purposes of

42 U.S.C. § 6306(b), rules are "prescribed" when they are published in the Federal

Register. *See Natural Res. Def. Council v. Abraham*, 355 F.3d 179, 196 & n.8 (2d Cir.

2004) (interpreting "prescribed" in § 6306(b)(1) to refer to publication in the Federal

Register and noting that Congress used the words "publish" and "prescribe"

interchangeably in the consumer appliance provisions of EPCA); *see also Natural Res.*

*Def. Council v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018) (interpreting "prescribed" to mean "published" in a different judicial review provision of EPCA and explaining that the court in *Abraham* determined that § 6306(b)(1) "peg[s] the time for seeking review to the time when the rule is published in the Federal Register"); *Milice v. Consumer Prod. Safety Comm'n*, 2 F.4th 994, 1000 (D.C. Cir. 2021) (holding that a direct final rule was promulgated when it was published in the Federal Register, notwithstanding the fact that the agency could have subsequently withdrawn the rule in response to adverse comment).

The petition, insofar as it seeks review of the direct final rule, is untimely. The rule was prescribed when it was published in the Federal Register on February 14, 2024. Petitioners had 60 days thereafter, or until April 14, 2024, to seek review of the rule. They filed their petition on October 11, 2024, nearly six months past the 60-day deadline prescribed by 42 U.S.C. § 6306(b)(1). Pet. 1.

Because the petition was filed out of time, this Court does not have jurisdiction to review the rule. Under 42 U.S.C. § 6306(b)(2), this Court has "jurisdiction to review [a] rule" only after a petition is filed in accordance with the terms of § 6306(b)(1). 42 U.S.C. § 6306(b)(2). Thus, petitions that do not comply with the 60-day deadline provided in subsection (b)(1) are beyond the statute's grant of jurisdiction. This Court has held that similar language establishing a 60-day deadline to file a petition for review under the Hobbs Act "is jurisdictional and cannot be judicially altered or expanded." *City of Arlington v. FCC*, 668 F.3d 229, 237 (5th Cir.

2012) (quotation marks omitted); *see* 28 U.S.C. § 2342 (explaining that the court of appeals' "[j]urisdiction is invoked by filing a petition as provided by section 2344 of this title"); *id.* § 2344 (providing that an aggrieved party seeking review of an order reviewable under the Hobbs Act "may, within 60 days after its entry," file a petition for review).

**b.** This Court also lacks jurisdiction to review the confirmation notice because petitioners do not have Article III standing to challenge the notice. To invoke this Court's jurisdiction, petitioners must establish that they suffer an injury-in-fact that is fairly traceable to the notice and that it is likely that the requested relief will redress their alleged injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

Petitioners cannot satisfy Article III because the confirmation notice has no legal effect. As the notice explains, on February 14, 2024, the Department published a direct final rule that established "new and amended energy conservation standards" for cooking products. *Confirmation Notice*, 89 Fed. Reg. at 65,520. The rule became effective on June 13, 2024, and compliance with its standards is required on January 31, 2028. *Id.* The Department determined that comments it received in response to the rule did not provide a reasonable basis for withdrawing the rule under 42 U.S.C. § 6295(p)(4)(C), and so it did not withdraw the rule within the 120 days allowed by statute. 42 U.S.C. § 6295(p)(4)(C). Months after that withdraw deadline passed, the Department published the confirmation notice as a courtesy. *Confirmation Notice*, 89 Fed. Reg. at 65,520. The notice included a summary of comments received during the

110-day comment period and the Department's responses to those comments, even though doing so is "not required under EPCA." *Id.* at 65,521. The notice also confirmed "the effective and compliance dates of [the] standards" established in the direct final rule. *Id.* at 65,520.

The notice did not amend the standards established in the direct final rule, it did not alter the rule's effective or compliance dates, nor did it otherwise have any legal effect. Because it had no legal effect, the notice could not have inflicted any injury on petitioners. An order by this Court vacating and setting aside the notice would likewise have no legal effect and therefore cannot redress any injury petitioners allegedly suffer. Petitioners thus do not have standing to challenge the notice.

**2.a.** In their opposition to the government's motion to dismiss, petitioners argue that § 6306(b)(1)'s 60-day deadline is triggered when DOE publishes a confirmation notice, because, in their view, the direct final rule "was not truly final until DOE decided to reject Petitioners' comments and proceed." Pets.' Opp. 14. That interpretation is contrary to EPCA's plain text, which describes a direct final rule issued pursuant to 42 U.S.C. § 6295(p)(4) as a "final rule" when it is published. 42 U.S.C. § 6295(p)(4)(A)(i); *see also id.* § 6295(p)(4)(C)(iii) (explaining that a direct final rule ceases to be a "final rule" for purposes of subsection (o) if it is withdrawn). Petitioners offer no textual support for their interpretation, nor could they: EPCA's direct final rule provisions do not require the Department to issue a confirmation notice or take any other action after the Secretary determines not to withdraw a direct

final rule.  *See id.* § 6295(p)(4).  Congress would not have tethered a judicial review provision to an event that is not statutorily required and that DOE has performed only as a courtesy in the course of executing the statute.

Petitioners' interpretation also runs headlong into the D.C. Circuit's decision in *Milice*, where the court held that a direct final rule issued by the Consumer Product Safety Commission was final agency action when it was published, even though the rule's preamble stated that the Commission "would withdraw the [rule] before its effective date if it received significant adverse comment."  2 F.4th at 999-1000.  The court explained that the direct final rule "was final agency action" when published because it satisfied both conditions for finality established in *Bennett v. Spear*, 520 U.S. 154 (1997), "notwithstanding the possibility that the Commission might reconsider and change its standard in the future."  *Id.* at 1000.  The product safety rule, when published, marked the consummation of the agency's decision-making process because it established a new product safety standard, and legal consequences flowed from the rule, as it provided civil and criminal penalties for knowing violations of the safety standard.  *Id.*  The same is true here: DOE's direct final rule was final when published, notwithstanding the possibility that the agency might withdraw it up to 120 days later.  The rule "establish[es] and amend[s] energy conservation standards" for cooking tops and ovens, *Direct Final Rule*, 89 Fed. Reg. at 11,435, and manufacturers who fail to comply with those standards by the rule's compliance date face civil penalties, 42 U.S.C. § 6303.

But even if petitioners were correct that "the non-withdrawal determination . . . is the 'culminating event in the rulemaking process'" that starts the 60-day clock, their petition would still be untimely. Pets.' Opp. 15. EPCA mandates that DOE's decision to withdraw a direct final rule be made within 120 days of the rule being published. 42 U.S.C. § 6295(p)(4)(C)(i). The Department was therefore obligated to make its non-withdrawal determination by June 13, 2024. If, as petitioners contend, the rule became final on that date, their petition for review would have been due August 12—but the petition here was not filed until October 11.[2]

Petitioners also err in suggesting that DOE has "consistently" treated the publication of a confirmation notice as triggering § 6306(b)(1)'s deadline. Pets.' Opp. 12. All they offer in support of that claim is a settlement reached a decade ago in *American Public Gas Ass'n v. DOE*, No. 11-1485 (D.C. Cir. dismissed Apr. 24, 2014), where the government failed to challenge the underlying petition as untimely. But it is not at all clear that DOE treated the "confirmation notice as the calendaring event" in that case, Pets.' Opp. 11-12, because the petition was also filed within 60 days of DOE's deadline to withdraw the rule, *see* Pet. for Review, *American Pub. Gas Ass'n v.*

---

[2] For this reason, petitioners' comparison to requests for administrative reconsideration falls flat. Pets.' Opp. 13-14. Even assuming the incurable prematurity doctrine applies in this context—and petitioners have cited no caselaw in support of that proposition—then, as petitioners admit, the rule would have become final when "DOE decided to reject Petitioners' comments." Pets.' Opp. 14. DOE did so no later than June 13, 2024—four months before petitioners filed their petition for review.

*DOE*, No. 11-1485 (D.C. Cir. Dec. 23, 2011) (seeking review of direct final rule published June 27, 2011). The D.C. Circuit has since clarified in *Milice* that the deadline to file a petition for review runs from the date a direct final rule is published, not the withdrawal deadline. In any event, the government does not forfeit its ability to raise jurisdictional arguments in one case because it failed to do so in a different matter, a decade earlier. And other petitioners in this Circuit have observed § 6306(b)(1)'s clear timing requirement. *See* Pet. for Review, *Daquin v. DOE*, No. 24-60316 (5th Cir. June 18, 2024) (petition filed June 18, 2024, challenging direct final rule published in the Federal Register on April 24, 2024).

Relying on *Natural Res. Def. Council v. NHTSA*, 894 F.3d 95 (2d Cir. 2018), petitioners also contend that the judicial review provision is not jurisdictional. Pets.' Opp. 15-16. But the judicial review provision in *NHTSA* is materially different from the one at issue here. *NHTSA* involved 49 U.S.C. § 32909(b), which requires a petition for review to be "filed not later than 59 days after the regulation is prescribed." 49 U.S.C. § 32909(b). Critically, that provision does not mention the word "jurisdiction" or make clear that a court's power to review a petition for review is contingent upon such a petition being filed in accordance with the timing requirements. Section 6306 does. *See* 42 U.S.C. § 6306(b)(2) ("Upon the filing of the petition referred to in [§ 6306(b)(1)], the court shall have jurisdiction to review the rule . . . ."). As explained above, this Court has already held that language virtually identical to § 6306(b) is jurisdictional. *City of Arlington*, 668 F.3d at 237.

**b.** As for this Court's jurisdiction to review the confirmation notice, petitioners have not identified any injury they suffer that is traceable to the notice. Instead, petitioners have acknowledged that their alleged injuries flow from the direct final rule, which "constrain[s]" their "purchases of stoves, ovens, and the like." Pets.' Opp. 16. Petitioners' alleged injuries are thus traceable to the direct final rule, which established and amended energy conservation standards, not to DOE's subsequent decision not to withdraw the rule—and surely not to the Department's voluntary explanation of that decision.

Petitioners incorrectly suggest that the Court can "avoid" the issue of Article III standing because the confirmation notice's caption includes the term "Direct final rule." Pets.' Opp. 16-17; *Confirmation Notice*, 89 Fed. Reg. at 65,520. The notice's caption, "ACTION: Direct final rule; confirmation of effective and compliance dates," *Confirmation Notice*, 89 Fed. Reg. at 65,520, merely identifies its relation to the underlying action—consistent with agency practice—and is not a concession by the Department that the confirmation notice is itself a direct final rule. Indeed, the document makes abundantly clear that it serves only to confirm the dates on which the rule became effective and compliance is required, *see generally id.*, dates previously stated in the direct final rule. *Direct Final Rule,* 89 Fed. Reg. at 11,434. Consequently, the notice works no injury on petitioners, and an order of this Court vacating the notice could not redress any alleged harm.

**c.** Finally, because the petition for review could not have been brought in federal district court, the Court should reject petitioners' request to transfer the case to the Southern District of Mississippi if this Court dismisses the petition for want of jurisdiction. Pets.' Opp. 17-18; *see* 28 U.S.C. § 1631 (permitting transfer of an action "to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed"). Again, the petition seeks review of (1) the direct final rule published February 14, 2024, and (2) the confirmation notice published August 12, 2024. Pet. 1-2. Petitioners could not seek judicial review of the direct final rule in district court under the APA because the APA only provides a basis for judicial review when "there is no other adequate remedy in a court." 5 U.S.C. § 704. EPCA's judicial-review provision provides an adequate remedy: review in the court of appeals. That bars APA review. *See Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018). Petitioners likewise could not seek review of the confirmation notice in district court, because, as explained above, they lack standing. The petition should be dismissed.

## II.    DOE Was Not Required to Withdraw the Direct Final Rule.

If the Court reaches the merits, it should deny the petition. Under DOE's unique direct final rulemaking authority, the agency was not required to withdraw the direct final rule simply because petitioners commented in opposition. Instead, EPCA only requires DOE to withdraw a direct final rule if the Secretary determines, based on the rulemaking record, that an adverse comment provides a reasonable basis to

withdraw the rule under 42 U.S.C. § 6295(o) or other applicable law.  42 U.S.C.

§ 6295(p)(4)(C).  Petitioners' comments did not meet that standard, and DOE

appropriately declined to withdraw the rule.

### A. DOE need not withdraw a direct final rule merely because the agency receives adverse comments.

The statute at issue in this case, 42 U.S.C. § 6295(p)(4), authorizes DOE to use

an expedited rulemaking procedure to promulgate direct final rules setting energy

conservation standards for certain appliances.  As relevant here, the statute requires

DOE to withdraw a direct final rule no later than 120 days after the date on which it

was published if two conditions are met.  First, DOE must have received one or more

adverse public comments.  42 U.S.C. § 6295(p)(4)(C)(i)(I).  Second, the Secretary must

have determined that the adverse comments, "based on the rulemaking record[,] . . .

provide a reasonable basis for withdrawing the direct final rule under subsection (o)"

or other applicable law.  *Id.* § 6295(p)(4)(C)(i)(II).  That latter requirement grants

discretion to the agency to determine whether any public comment is sufficiently

adverse as to provide a "reasonable basis" for withdrawal.  *Id.*  That provision also

makes clear that DOE is not required to withdraw a direct final rule whenever it

receives adverse comments.

Petitioners insist that DOE must withdraw its direct final rule unless there is

"true consensus," but their arguments ignore EPCA's plain text and would render

§ 6295(p)(4)(C)(i)(II) surplusage.  Br. 22.  They observe that other agencies, when

promulgating direct final rules under the APA, withdraw such rules in response to any substantive adverse comment. Br. 19-21. They also point to DOE's proposed legislation for direct final rulemaking authority, which would have likewise required unanimity for direct final rules. Br. 22. But these facts only underscore that Congress took a different approach to direct final rulemaking in EPCA. Instead of mandating withdrawal of the direct final rule if the Secretary receives any adverse comment, Congress mandated withdrawal only when the agency receives one or more adverse comments *and* the Secretary determines that such comments provide a reasonable basis to withdraw the rule. 42 U.S.C. § 6295(p)(4)(C)(i). Petitioners are wrong to suggest that the direct final rule should have been withdrawn simply because they commented in opposition.

### B. Petitioners' comments did not provide a reasonable basis for withdrawing the direct final rule.

After publishing the direct final rule, DOE accepted public comments for a period of 110 days. During that time, petitioners submitted two comments. One comment, submitted by Nebraska with the support of 22 other States, argued that the Joint Agreement that proposed the efficiency standards adopted in the direct final rule was not submitted by parties "fairly representative of the relevant points of view," as EPCA requires. ARID.187, at 6. Nebraska's comment also accused DOE of failing to address comments that were submitted in a separate 2023 rulemaking. ARID.187, at 2-4. A second comment, submitted by Utah and joined by Montana, urged that

DOE had failed to consider how the direct final rule's amended standards would affect the lifespan of covered products. ARID.190, at 2-4. After careful consideration and based on the rulemaking record, DOE determined that petitioners' comments did not provide a reasonable basis to withdraw the direct final rule.

### 1. The Joint Agreement's sponsors are fairly representative of relevant points of view.

In the comment submitted by Nebraska, petitioners argued that the Joint Agreement did not satisfy the statute's "fairly representative" requirement because while three states—New York, California, and Massachusetts—supported the agreement, 23 States opposed the direct final rule. ARID.187, at 6. The States further argued that EPCA "requires the concurrence of States across the ideological spectrum" and the Joint Agreement did not satisfy that standard or "come close to approaching majority support." *Id.*

Petitioners' comment did not provide a reasonable basis to withdraw the direct final rule. Upon receipt of a statement "submitted jointly by interested persons that are fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates), as determined by the Secretary," DOE may issue a direct final rule adopting efficiency standards proposed by the joint statement, if those standards satisfy the requirements of § 6295(o). 42 U.S.C. § 6295(p)(4)(A). The statute's plain text vests discretion in the Secretary to "determin[e]" when a joint proposal meets the requirement for

representativeness.  *Id.*  Further, the statutory language does not require that joint proposals be "representative of *every* point of view," nor does EPCA require that a statement "be submitted by *all* interested persons."  *Confirmation Notice*, 89 Fed. Reg. at 65,530-31.  The ordinary meaning of the phrase "fairly representative" implies just the opposite—that DOE need only find that the signatories to a joint statement represent a substantial range of relevant viewpoints.

DOE did not abuse its discretion in determining that the Joint Agreement "was submitted by interested persons who are fairly representative of relevant points of view."  *Direct Final Rule*, 89 Fed. Reg. at 11,446.  The Agreement was negotiated by 11 signatories, including the Association of Home Appliance Manufacturers (AHAM), which represents 19 manufacturers of consumer cooking appliances, environmental and energy-efficiency advocacy organizations, consumer advocacy organizations, and a gas and electric utility company.  *Id.*  Three States—New York, California, and Massachusetts—helped negotiate the recommended standards and submitted a letter in support of the Joint Agreement, as did two utility companies.  *Id.*; ARID.164, at 3; ARID.165; ARID.166.  As the Joint Agreement was supported by "[r]epresentatives from each of the relevant points of view described in 42 U.S.C. 6295(p)(4)," DOE reasonably determined that it satisfied the statute's standard for representativeness.  *Confirmation Notice*, 89 Fed. Reg. at 65,530.

As DOE explained in its confirmation notice, nothing in EPCA's text requires or even suggests that a joint statement must be supported by a majority of States

representing a range of political views. *Confirmation Notice*, 89 Fed. Reg. at 65,531.

"Rather, EPCA ensures a diversity of opinions and interests" by requiring that a joint

statement be supported by key stakeholders representing a range of interests relevant

to energy efficiency standards, including "representatives of manufacturers of covered

products, States, and efficiency advocates." *Id.*

Putting aside the textual problems with petitioners' argument, their reading of

the statute would seriously undermine Congress's purpose in granting DOE its unique

authority to set energy conservation standards through direct final rulemaking.

Congress amended EPCA in response to lengthy delays DOE had encountered in the

course of ordinary notice-and-comment rulemaking, and it designed EPCA's direct

final rulemaking provisions to encourage key stakeholders to negotiate energy

conservation standards, thereby accelerating the rulemaking process. *See Achieving—*

*At Long Last—Appliance Efficiency Standards, Hearing Before the H. Subcomm. on Energy and*

*Air Quality, Comm. On Energy and Commerce*, 110th Cong. 1-2 (2007) (statement of Rep.

Boucher) (describing "longstanding delays" in establishing or amending energy

efficiency standards and DOE's failure to comply with statutory deadlines for

rulemakings); *id.* at 8 (statement of Assistant Secretary Karsner) (discussing legislation

proposed by DOE that would "shorten the time to a completed standard" by

allowing the agency to issue a direct final rule "when a clear consensus for standards

exist among the manufacturers, efficiency advocates, and other stakeholders").

Requiring that a joint statement garner the support of a majority of States from across

the ideological spectrum would severely slow, if not undermine entirely, the very negotiations Congress sought to promote.

Petitioners also incorrectly suggest that DOE was required to withdraw the direct final rule after 23 States voiced their opposition to the rule. Br. 27. EPCA directs the agency to evaluate adverse comments to determine whether, "based on the rulemaking record," those comments provide a "reasonable basis for withdrawing the direct final rule under [42 U.S.C. § 6295(o)]" or other applicable law. 42 U.S.C. § 6295(p)(4)(C)(i)(II). Subsection (o) provides criteria for prescribing energy efficiency standards, including that the standard be designed to achieve the "maximum improvement in energy efficiency" that is "technologically feasible and economically justified." *Id.* § 6295(o)(2)(A). Nothing in that subsection or in EPCA's direct final rulemaking provisions suggests that a direct final rule must be withdrawn if it is opposed by a certain number of States. To the contrary, "it is the substance of the comments, not the number of stakeholders that submit statements in favor of, or opposed to, the joint agreement, that determines whether a rule should be withdrawn." *Confirmation Notice*, 89 Fed. Reg. at 65,531. DOE appropriately determined that petitioners' comment did not provide a reasonable basis to withdraw the direct final rule.

## 2. DOE was not required to respond to comments that were submitted in a separate 2023 rulemaking.

In the comment submitted by Nebraska, petitioners also argued that the direct final rule failed to address comments that were submitted by AHAM and Whirlpool in a separate 2023 rulemaking. ARID.187, at 2-3. In February 2023, DOE proposed efficiency standards for consumer conventional cooking products in a Supplemental Notice of Proposed Rulemaking (SNOPR). 88 Fed. Reg. at 6818. While that rulemaking was underway, AHAM and others submitted the Joint Agreement, which proposed negotiated standards for cooking products. ARID.164. DOE elected to adopt those negotiated standards via direct final rule and abandoned the 2023 SNOPR. *Direct Final Rule*, 89 Fed. Reg. at 11,444. DOE did, however, consider "relevant comments, data, and information obtained during" the 2023 rulemaking process "in determining whether the recommended standards" satisfied the criteria of § 6295(o). *Id.* at 11,444-45. The standards adopted in the direct final rule differ from those DOE proposed in the 2023 SNOPR. *Compare Direct Final Rule*, 89 Fed. Reg. at 11,436, *with 2023 SNOPR,* 88 Fed. Reg. at 6820.

Petitioners commented that the direct final rule failed to address concerns AHAM had raised in response to the 2023 SNOPR regarding consumer preferences and the proposed standards' impacts on low-income consumers. ARID.187, at 3. They also faulted the direct final rule for not adequately addressing concerns raised by Whirlpool regarding "supply-chain issues with the proposed [2023] rule." *Id.*

Petitioners now urge that DOE's alleged failure to address these comments in the direct final rule—notwithstanding the fact that they were submitted in a separate rulemaking—should have triggered EPCA's withdrawal provision. Br. 27-28. That is incorrect.

As the confirmation notice explains, the 2024 direct final rule "is a separate rulemaking, conducted under a different statutory authority from DOE's prior rulemaking in the February 2023 SNOPR." *Confirmation Notice*, 89 Fed. Reg. at 65,531-32. Consequently, DOE was not required to consider comments submitted in response to the 2023 SNOPR in its 2024 direct final rule. *Id.* at 65,532. Petitioners offer no authority to the contrary, *see* Br. 26-28, and their insistence that DOE was obliged to address comments it received in response to the 2023 SNOPR is particularly unpersuasive because the standards proposed in the 2023 SNOPR differ from those adopted in the direct final rule. *Confirmation Notice*, 89 Fed. Reg. at 65,532.

In any event and although it was not required to do so, DOE did address the concerns raised by AHAM and Whirlpool in the direct final rule. With respect to Whirlpool's concern about the supply chain, the direct final rule noted that 77% of electric smooth element cooking tops, 97% of gas cooking tops, 95% of electric ovens, and 96% of gas ovens will meet or exceed the standards set by the direct final rule in the first year of required compliance. *Direct Final Rule*, 89 Fed. Reg. at 11,516. Because "a significant portion of the market already meets or exceeds the adopted

standard," DOE reasoned that it is "very unlikely that the adopted standard will impact the cooking product supply chain." *Confirmation Notice*, 89 Fed. Reg. at 65,532.

Similarly, DOE addressed AHAM's concerns regarding the availability of features and functionalities consumers prefer. *Direct Final Rule*, 89 Fed. Reg. at 11,526. The agency concluded that the features and functionalities important to consumers could be retained under the direct final rule and that the amended standards did not preclude any combination of such features in either gas or electric cooktops. *Id.* at 11,526-28. AHAM agreed; the organization commented in support of the direct final rule, noting that both gas and electric cooking products can meet the rule's standards "while preserving important consumer features." *Confirmation Notice*, 89 Fed. Reg. at 65,532.[3]

Finally, the direct final rule addresses concerns raised by AHAM in the 2023 SNOPR regarding the rule's economic impact on low-income consumers. *Direct Final Rule*, 89 Fed. Reg. at 11,478. DOE separately evaluated the rule's impact on low-income consumers by performing a subgroup analysis focused on low-income households. *Id.* at 11,488-89. Notably, the direct final rule adopted a less-stringent standard for gas cooking tops than had been proposed in the 2023 SNOPR. As a

---

[3] Petitioners repeatedly suggest that there is something unusual or unlawful about AHAM's support for the direct final rule given that the organization opposed the 2023 SNOPR. *See* Br. 24-28. But it is hardly remarkable that AHAM supported energy efficiency standards that (1) it negotiated and (2) are less stringent than those proposed by DOE in the 2023 SNOPR. *Compare Direct Final Rule*, 89 Fed. Reg. at 11,436, *with 2023 SNOPR*, 88 Fed. Reg. at 6820.

result, DOE determined that less than one percent of low-income households will experience a net cost from the direct final rule, compared to 18% of low-income households under the 2023 proposal. *Confirmation Notice*, 89 Fed. Reg. at 65,532.

Although it was not required to do so, DOE thus considered and addressed the industry concerns raised in the 2023 SNOPR. Accordingly, the agency reasonably determined that petitioners' comment did not provide a reasonable basis to withdraw the direct final rule.

### 3. DOE reasonably determined that the direct final rule's standards will not make affected products less reliable.

Finally, in a comment submitted by Utah, petitioners argued that DOE failed to adequately consider whether the amended standards would reduce the lifetime of affected cooking products. ARID.190, at 2-4. Petitioners surmised that the standards would increase the products' complexity, which would in turn make them less reliable and shorten their lifespan. ARID.190, at 3. Relatedly, petitioners suggested that increasing complexity would make products more difficult and costly to repair, leading consumers to replace them instead. *Id.* Because petitioners' comment was based on theoretical conjecture and failed to rebut data before the agency indicating that the adopted standards were achievable without sacrificing reliability, DOE properly determined that petitioners' comment did not provide a reasonable basis for withdrawing the rule.

**a.** Before prescribing a new or amended energy efficiency standard, DOE must find that the standard is "economically justified." 42 U.S.C. § 6295(o)(2)(A). In assessing whether a standard is economically justified, DOE must consider whether its benefits exceed its burdens, considering, among other things, the "savings in operating costs throughout the estimated average life of the covered product . . . compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard." *Id.* § 6295(o)(2)(B)(i)(II).

In the direct final rule, DOE conducted this comparison by analyzing the life-cycle cost (LCC) for affected cooking products. *Direct Final Rule*, 89 Fed. Reg. at 11,436. The LCC is the total consumer expense of the product, including purchase, installation, and operation, discounted over the lifetime of the product. *Id.* at 11,473. To determine the rule's economic impact on consumers, DOE assesses whether the LCC rises, signifying an increased cost to consumers, or falls, signifying savings, when efficiency standards are increased. *Id.* Here, DOE determined that the direct final rule would result in LCC savings for all product classes affected by the rule. *Id.* at 11,436-37.

Critical to DOE's LCC analysis is the estimated lifetime of covered products. In the direct final rule, DOE estimated the average lifetime of electric cooking products to be 16.8 years and the average lifetime of gas cooking products to be 14.5 years. *Direct Final Rule*, 89 Fed. Reg. at 11,477. DOE arrived at those estimates using

a "variety of sources," including input from AHAM regarding the average useful life for different product categories. *Id.* To account for uncertainty and variability in lifetimes, DOE used "a distribution of values, with probabilities attached to each value," in its LCC analysis. *Id.* at 11,447.

Petitioners posited that the amended standards would decrease the lifetimes of affected products, but DOE reasonably rejected that theoretical concern in light of industry data supporting its estimates of product lifetime. DOE arrived at those estimates "based on feedback from manufacturers." *Confirmation Notice*, 89 Fed. Reg. at 65,526. And DOE had good reason to trust the accuracy of its estimates because, as AHAM noted in its own comment supporting the direct final rule, the technologies identified for meeting the amended standards are "established technologies used in the market today and do not negatively impact product reliability." *Id.* DOE also undertook "a review of cooking product reliability information of most major brands," which offered "no indication that higher-efficiency products are less reliable at the adopted standard levels relative to baseline products." *Id.* Against this real-world data, petitioners offered only "theoretical conjecture that higher-efficiency products may have poor reliability based on simplified textbook models." *Id.* But petitioners offered no data to suggest that the technologies used to increase energy efficiency in cooking products render those products less reliable. *Id.* Given that the real-world data indicated just the opposite, DOE reasonably determined that

30

petitioners' comment did not provide a reasonable basis to withdraw the direct final rule.

**b.** Petitioners' attempts to challenge that determination are unpersuasive. They point to a 2008 notice of proposed rulemaking in which DOE expressed reservations about mandating switching power supplies for microwave ovens, noting that the change could reduce the reliability of microwaves. Br. 29; *see* Energy Conservation Program: Energy Conservation Standards for Certain Consumer Products (Dishwashers, Dehumidifiers, Electric and Gas Kitchen Ranges and Ovens, and Microwave Ovens) and for Certain Commercial and Industrial Equipment (Commercial Clothes Washers), 73 Fed. Reg. 62,034, 62,051 (Oct. 17, 2008). But DOE's acknowledgment that a proposed standard could reduce reliability—of a different product, in a separate rulemaking, 15 years ago—does not undermine the data before the agency when it prescribed and then declined to withdraw the direct final rule. Those data showed that the rule's standards could be achieved using available technologies without any reduction in product reliability or lifespan. *Confirmation Notice*, 89 Fed. Reg. at 65,527.[4]

Petitioners also erroneously contend (Br. 30-32) that DOE improperly rejected their comment because it did not provide data specific to the standards in the direct

---

[4] Petitioners thus err in insisting that DOE must "justify its change in position." Br. 32. Putting aside the fact that technologies can change and improve over time, the statements about reliability that petitioners identify were in reference to technology for microwave ovens, which are not regulated by the direct final rule.

final rule. As DOE explained in its confirmation notice, the agency calculated average product lifetimes for cooking products based on industry data. *Confirmation Notice*, 89 Fed. Reg. at 65,526. DOE had good reason to rely on that data given that the technologies necessary to achieve the rule's standards are already in use, and, as AHAM noted, those technologies "do not negatively impact product reliability." *Id.* In light of the real-world data indicating that the rule would not reduce product reliability—and because petitioners failed to provide, and DOE was not aware of any data to the contrary—DOE determined that petitioners' theoretical arguments did not provide a reasonable basis to withdraw the rule.[5] *Id.*

Petitioners incorrectly assert that DOE did not consider whether repair costs would increase under the direct final rule's standards. Br. 34. When issuing the direct final rule, DOE "updated repair costs for all product classes based on available online data." *Direct Final Rule*, 89 Fed. Reg. at 11,477. DOE determined that, with the exception of electric smooth element cooking tops, "repair costs do not vary by efficiency level, . . . leading to no additional repair cost as a result" of the direct final rule. *Id.* That finding is in keeping with DOE's "review of cooking product reliability information of most major brands," which "provides no indication that higher-efficiency products are less reliable" at the adopted standards relative to baseline

---

[5] Given the abundant data supporting DOE's estimated product lifetimes and industry's concurrence that those estimates are accurate, *Confirmation Notice*, 89 Fed. Reg. at 65,526-27, as well as petitioners' failure to marshal any contrary data, DOE did not need to perform a "sensitivity analysis," as petitioners suggest, Br. 33.

products. *Confirmation Notice*, 89 Fed. Reg. at 65,527. As DOE noted in its confirmation notice, AHAM commented in support of the rule's repair cost analysis. *Id.*

Petitioners conclude their brief by emphasizing the importance of product lifespan in evaluating whether efficiency standards ultimately save energy. Br. 35-37. DOE does not dispute that contention as a general principle. But petitioners' comment did not provide a reasonable basis for questioning the direct final rule's estimated product lifetimes. Those estimates were developed based on industry data, and manufacturers commented in support of the direct final rule, noting that the amended standards will not decrease product reliability or lifespan. *Confirmation Notice*, 89 Fed. Reg. 65,526-27. In view of that evidence, petitioners' comment hypothesizing that affected products will be less reliable did not provide a reasonable basis to withdraw the rule.

# CONCLUSION

For the foregoing reasons, the petition should be dismissed for lack of jurisdiction or denied on the merits.

Respectfully submitted,

*Of Counsel:*

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

DAVID R. TAGGART
   *Acting General Counsel*

BRENT ALLEN
   *Deputy General Counsel for Environment and
     Litigation*

   *Department of Energy*

MICHAEL S. RAAB
   *s/ Sarah N. Smith*
SARAH N. SMITH
   *Attorneys, Appellate Staff
   Civil Division, Room 7533
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 305-0173
   Sarah.N.Smith@usdoj.gov*

April 2025

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sarah N. Smith*
Sarah N. Smith

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,159 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.


*s/ Sarah N. Smith*
Sarah N. Smith

**ADDENDUM**

## TABLE OF CONTENTS

42 U.S.C. § 6295 (excerpts) ............................................................... A1

42 U.S.C. § 6306 (excerpts) ............................................................... A3

**42 U.S.C. § 6295 (excerpts)**

**§ 6295—Energy Conservation Standards**

…

**(p) Procedure for prescribing new or amended standards**

Any new or amended energy conservation standard shall be prescribed in accordance with the following procedure:

…

### (4) Direct final rules

#### (A) In general

On receipt of a statement that is submitted jointly by interested persons that are fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates), as determined by the Secretary, and contains recommendations with respect to an energy or water conservation standard--

**(i)** if the Secretary determines that the recommended standard contained in the statement is in accordance with subsection (o) or section 6313(a)(6)(B) of this title, as applicable, the Secretary may issue a final rule that establishes an energy or water conservation standard and is published simultaneously with a notice of proposed rulemaking that proposes a new or amended energy or water conservation standard that is identical to the standard established in the final rule to establish the recommended standard (referred to in this paragraph as a "direct final rule"); or

**(ii)** if the Secretary determines that a direct final rule cannot be issued based on the statement, the Secretary shall publish a notice of the determination, together with an explanation of the reasons for the determination.

#### (B) Public comment

The Secretary shall solicit public comment for a period of at least 110 days with respect to each direct final rule issued by the Secretary under subparagraph (A)(i).

**(C) Withdrawal of direct final rules**

**(i) In general**

Not later than 120 days after the date on which a direct final rule issued under subparagraph (A)(i) is published in the Federal Register, the Secretary shall withdraw the direct final rule if--

**(I)** the Secretary receives 1 or more adverse public comments relating to the direct final rule under subparagraph (B)(i)[4] or any alternative joint recommendation; and

**(II)** based on the rulemaking record relating to the direct final rule, the Secretary determines that such adverse public comments or alternative joint recommendation may provide a reasonable basis for withdrawing the direct final rule under subsection (o), section 6313(a)(6)(B) of this title, or any other applicable law.

**(ii) Action on withdrawal**

On withdrawal of a direct final rule under clause (i), the Secretary shall--

**(I)** proceed with the notice of proposed rulemaking published simultaneously with the direct final rule as described in subparagraph (A)(i); and

**(II)** publish in the Federal Register the reasons why the direct final rule was withdrawn.

**(iii) Treatment of withdrawn direct final rules**

A direct final rule that is withdrawn under clause (i) shall not be considered to be a final rule for purposes of subsection (o).

   …

  …

…

**42 U.S.C. § 6306 (excerpts)**

**§ 6306—Administrative procedure and judicial review**

…

**(b) Petition by persons adversely affected by rules; effect on other laws**

**(1)** Any person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title may, at any time within 60 days after the date on which such rule is prescribed, file a petition with the United States court of appeals for the circuit in which such person resides or has his principal place of business, for judicial review of such rule. A copy of the petition shall be transmitted by the clerk of the court to the agency which prescribed the rule. Such agency shall file in the court the written submissions to, and transcript of, the proceedings on which the rule was based, as provided in section 2112 of Title 28.

**(2)** Upon the filing of the petition referred to in paragraph (1), the court shall have jurisdiction to review the rule in accordance with chapter 7 of Title 5 and to grant appropriate relief as provided in such chapter. No rule under section 6293, 6294, or 6295 of this title may be affirmed unless supported by substantial evidence.

…

…